UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CASH FLOW FINANCIAL, LLC,

                      Plaintiff,                         **MEMORANDUM & ORDER**
                                                                **09 CV 5002 (DRH)(ETB)**

        -against-

JASON MICHAEL MEYER,
M5 ENTERPRISES, LLC,
ANTHONY CAPPAZE,
ROYAL SOVEREIGN GROUP LLC,
KENNETH MORELLI
LAWRENCE DURBIN,
WORLDWIDE RESOURCES USA, LLC,
SBC LENDING, INC.,
GERALD DALE HENDRIX,
M. HAROON RASHID,
3 HOOLIGANS INVESTMENT PROPERTIES, LLC,
and FORTUNE FINANCIAL INVESTMENTS AND
CONSULTING, LLC d/b/a FORTUNE FIC, LLC,

                      Defendants.
------------------------------------------------------------X

**APPEARANCES:**

**Harry H. Wise, III, Esq.**
Attorney for Plaintiff
250 West 57th Street, Suite 1316
New York, New York 10107

**Hogan & Cassell, LLP**
Attorneys for Defendants Jason Michael Meyer, M5 Enterprises LLC, 3 Hooligans Investment Properties LLC, and Fortune Financial Investments and Consulting LLC
500 North Broadway, Suite 153
Jericho, New York 11753
By:    Michael Cassell, Esq.

**Anthony T. Colasanti, Esq.**
Attorney for Defendants Anthony Cappaze and Royal Sovereign Group
4 York Avenue, Second Floor
West Caldwell, New Jersey 07006

**Steven Zalewski & Associates, P.C.**
Attorney for Defendants Lawrence Durbin and SBC Lending, Inc.
125-10 Queens Boulevard, Suite 218
Kew Gardens, New York 11415
By:     Steven Zalewski, Esq.


**HURLEY, Senior District Judge:**

Plaintiff brings this action alleging violations of the Securities Exchange Act, 15 U.S.C. §§ 78j and 77q, the Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.*, and for fraud, conversion, and breach of contract.  Currently before the Court is plaintiff's motion for summary judgment solely as to its claims for (1) both fraud and conversion against defendants Jason Michael Meyer ("Meyer"), M5 Enterprises LLC ("M5"), 3 Hooligans Investment Properties LLC ("3 Hooligans"), and Fortune Financial Investments and Consulting LLC ("Fortune") (collectively, "Meyer defendants");[1] (2) fraud against Lawrence Durbin ("Durbin") and SBC Lending Inc. ("SBC"); and (3) conversion against Anthony Cappaze ("Cappaze") and the Royal Sovereign Group LLC ("Royal Sovereign"). (Pl.'s Notice of Motion for Summary Judgment.)  Plaintiff's claims against all other defendants, *viz.* Kenneth Morelli, Gerald Dale Hendrix, M. Harood Rashid, and Worldwide Resources, USA, LLC have been dismissed either by stipulation of dismissal or voluntary discontinuance. (See Orders Dated 12/23/10 and 1/11/11.)  For the reasons that follow, plaintiff's motion is denied.

---

[1] The Court previously granted the Meyer defendants' request for leave to file a cross motion for summary judgment. (*See* Order dated 12/7/10.)  Although the Meyer defendants have opposed plaintiff's motion for summary judgment, they have not filed their own cross motion for summary judgment.

# BACKGROUND

## I. PLAINTIFF'S CLAIMS

### a. Facts Pertaining to the Meyer Defendants

The allegations in the Complaint arise from investments that Alan J. Watson ("Watson"), plaintiff's principal, made with defendant Meyer to perform leveraged trades of United States Treasury Bills ("T-bills"). (*Id.* ¶¶ 2-3.) The investments consisted of two money transfers in the amounts of $2.5 million and $1.4 million from plaintiff's account at Charter One Bank to a Merrill Lynch investment account managed by Meyer. (Plaintiff's Statement Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1") ¶ 1.)[2] Leading up to these transfers, Meyer had told Watson that he had a "system for leveraged trading of T-bills that could produce profits of fifty percent per month," and that could yield as much as $200,000 per day on certain days. (*Id.* ¶¶ 2-4.)

Shortly after Watson made the first transfer of $2.5 million on June 5, 2009, Meyer informed him that in order to execute the trades, the money would have to be transferred into a separate Merrill Lynch account at the same branch belonging to defendant Royal Sovereign and managed by defendant Cappaze. (*Id.* ¶ 6.) Watson initially expressed his reluctance in making the transfer, but later relented when Meyer presented a proposed agreement between Royal Sovereign and Watson limiting the use of plaintiff's funds to the purchase of "Zero Coupon" T-bills, and promising that the purchased T-bills would be transferred back into Watson's account. (*Id.* ¶ 7; Pl.'s Ex. C.) Watson now suggests, however, that the agreement was a "fake" and that Meyer forged Cappaze's signature. (Pl.'s 56.1 ¶ 7.)

Between mid-June and late-July of 2009, Watson received a number of emails from Meyer stating that his investments were doing well. (*Id.* ¶ 9; *see, e.g.*, Email dated 6/25/09, Pl.'s

---

[2] Plaintiff's statement of material fact pursuant to Local Civil Rule 56.1 is embedded within its memorandum of law in support of its motion.

Ex. G.) Then, at some point towards the end of July 2009, Meyer informed Watson that in order to engage in "the kind of leveraged investments that [Meyer] wanted to do," plaintiff would need to maintain $5 million in his investment account. (Pl.'s 56.1 ¶ 10.) As Watson's account had purportedly earned a $1.1 million profit at that point, an additional $1.4 million transfer by Watson into Meyer's investment account would suffice.[3] (Watson Decl. ¶ 16.) Watson agreed to increase his investment and, at Meyer's direction, transferred the $1.4 million to the escrow account of former defendant Morelli in a Chase Bank branch in Bellport, New York. (Pl.'s 56.1 ¶ 11.)

Plaintiff claims that in the end, none of these funds were used for the leveraged acquisition of T-bills or any other leveraged transaction, but were instead diverted to different investments without plaintiff's consent. (*Id.* ¶ 12.) Specifically, plaintiff asserts that Morelli, who at times held these funds in his escrow account, transferred $712,240 of plaintiff's money, at Meyer's behest, to an account in the United Arab Emirates maintained by Red Orange LLC. (*Id.*) Meyer also purportedly instructed Morelli to transfer $761,000 to the defendant company 3 Hooligans, which was, or is, allegedly "controlled" by Meyer. (*Id.*) Despite numerous demands from Watson for an accounting and return of his capital, Meyer has only paid back $635,000 of the investments. (*Id.* ¶ 13.)

In defense of plaintiff's claims, the Meyer defendants have furnished, *inter alia*, releases from both plaintiff and Watson—both signed by Watson—which, in exchange for the payment of $2,265,000, discharge all claims that either plaintiff or Watson may have against the Meyer

---

[3] Plaintiff alleges that Meyer's representation that his account had earned this $1.1 million profit was false. (Compl. ¶ 19.)

defendants arising from events occurring before the date of the execution of that document.[4] (Meyer Defs.' Ex. 3.)  The releases explicitly acknowledge receipt of the consideration payment.

### b. *Facts Pertaining to Defendants Cappaze and Royal Sovereign*

Cappaze became involved in the investment scheme when, according to his testimony, Meyer called him in or around May of 2009 to tell him that he had a "friend," *i.e.* Watson, who was interested in investing with Cappaze. (Cappaze Dep. 34.)  Cappaze floated a number of possible investment ideas with Meyer, but focused primarily on a certain gold-mining venture in Ecuador. (*Id.* 35-36.)  Watson then made the $2.5 million transfer, mentioned above, into the account of Cappaze's company Royal Sovereign.[5] (*Id.* 37-38.) Shortly after this transfer, Cappaze began speaking directly to Watson about investing in the gold venture. (*Id.* 38.) According to Cappaze, no firm commitments were made at that point.  Watson allegedly told him that he "trust[ed]" what Cappaze was doing, and Cappaze asked Watson to send him a letter of commitment. (*Id.*)

Cappeze testified that he then got a call from Meyer in late June or early July 2009 stating that Watson wanted Cappeze to wire the investment money back to Meyer through Morelli's escrow account because he was not "moving [the] money fast enough." (*Id.* at 39, 41; Pl.'s 56.1 ¶ 14.)  As Watson states in his written declaration submitted in conjunction with the present motion, Meyer told him at that time that he was growing unhappy with "Cappaze's conservative approach." (Watson Decl. ¶ 12.)

---

[4] The language of the Releases discharges all claims arising prior to the "date of this Release."  Although both releases were dated, these dates are largely illegible on the copies provided to the Court.  Plaintiff's release can be narrowed only to some date in 2009, while Watson's is dated some day in October 2009.

[5] Cappaze denies that he ever saw the agreement between Watson and Royal Sovereign that plaintiff claims was forged by Meyer. (Cappaze Dep. at 42.)  Cappaze further denies that the signature on that document is his.

Of the funds due to be returned, however, plaintiff alleges, and Cappaze admits, that Cappaze retained $500,000. (Meyer Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Meyer 56.1") ¶ 71; Cappaze Dep. 51-52, 59.) In his deposition, Cappaze stated that he kept this money because, as he told Watson at the time, he "needed at least to retain some capital until he sent me the other money."[6] (Cappaze Dep. 53.) Cappaze insists that Watson agreed to this arrangement. (*Id.*) In September 2009, Cappaze returned another $200,000. (*Id.* 59-60; Meyer 56.1 ¶ 72.)

Cappaze does not dispute that he failed to remit the remaining $300,000 to plaintiff, but contends that it had been invested in the gold venture, which Watson purportedly had originally "agreed to." (Cappaze Dep. at 60.) However, Cappaze's testimony as to what he represented to Watson regarding the use of plaintiff's money appears to conflict with itself. The following excerpts illustrate the discrepancy.

> Q. Had you had a conversation with Mr. Watson and told him you were going to take his two and a half million dollars and invest it in an Ecuadorean gold company?
> A. Yes.
> . . .
> Q. At any time did Mr. Watson tell you okay, take my money and invest it in your gold deal, either in words or substance?
> A. No, he never said that to me.
> Q. And did you ever tell him in words or substance, I'm taking your money and investing it in a gold deal?
> A. I don't believe I ever said that.

(Cappaze Dep. at 47, 50.)

Plaintiff moves here for summary judgment against Cappaze and Royal Sovereign solely for the alleged conversion of this $300,000 balance, which plaintiff contends has been "lost" in the gold venture. (*See* Pl.'s 56.1 ¶ 14.)

---

[6] Although it is not entirely clear from the record what Cappaze means by "other money," Cappaze appears to be referring to Watson's purported representation that he would invest a total of $5 million in the Ecuadorean gold venture. (*See* Cappaze Dep. at 59-60.)

### c. *Facts Pertaining to Defendants Durbin and SBC*

According to a loan agreement furnished by plaintiff, on or around August 28, 2009, Meyer, acting in his capacity as CEO of M5, entered M5 into an arrangement with Durbin and SBC to lend them $1.1 million as part of a plan to, among other things, "list valuable Mexican historic bonds on one or more trading screens." (Contractual Loan Agreement ("Loan Agreement"), Pl.'s Ex. C; Pl.'s 56.1 ¶¶ 15-16; Durbin Dep. at 47.) As stated in the agreement, SBC was to transfer this money to an unnamed "client"[7] in order to invest in two unspecified "trading programs." (Loan Agreement at 1-2.) The principal, plus $200,000 in interest, would be paid back to M5 within 45 days. (*Id.*) An additional bonus of $500,000 would also be paid to M5 once SBC received proceeds from the underlying investment. (*Id.*)

The investment deal was secured by a "Mexican gold bond" purportedly valued at $55,000,000 which was held in a bank safe deposit in Fort Lauderdale, Florida. (Loan Agreement at 2.) Both SBC and the client were to hold keys to this safe deposit box, and the bond was to be "release[d]" to the client once the client paid SBC, and SBC paid M5. (*Id.*) A "soybean contract" owned by the client was also offered as collateral for the principal and interest owed to M5. (*Id.*)

Apparently, Meyer provided only $500,000 of the anticipated $1.1 million loan, transferring the money through defendant Worldwide Resources USA, LLC. (Durbin Dep. at 47, 51-52.) Plaintiff claims that this $500,000 came from the money plaintiff had invested with

---

[7] It appears from Durbin's deposition that the referenced "client" was some combination of former defendants Worldwide Resources USA, LLC, Gerald Dale Hendriz, and M. Haroon Rashid. (*See* Durbin Dep. at 27-40.)

Meyer, (Pl.'s 56.1 ¶ 15), a transfer that Watson contends was never authorized, (Watson Dep. II[8] at 83).

As noted above, plaintiff moves for summary judgment against Durbin and SBC solely on the claim for fraud. This claim is articulated in plaintiff's Rule 56.1 factual statement as follows:

> Durbin obtained $500,000 of the money plaintiff transferred to Mr. Meyer by touting a completely fraudulent investment involving "historic Mexican bonds." . . . Among the fraudulent misrepresentations made by Mr. Durbin to cause defendant Meyer to wire-transfer the money to defendant Worldwide Resources USA, LLC, was the representation that he, Mr. Durbin, had in a safe deposit box a bond that had been valued by an agency of the Mexican government at more than $50,000,000. This representation was false, and Mr. Durbin had no reasonable grounds to believe it to be true.

(Pl.'s 56.1 ¶¶ 15-16; *see also* Compl. ¶ 21.)

## II. THE CFTC ACTION

On March 10, 2011, after the instant action had been commenced, the Commodity Futures Trading Commission ("CFTC") brought a civil action (hereinafter, the "CFTC action") in the United States District Court for the Eastern District of Michigan against, *inter alia*, plaintiff and Watson, alleging violations of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1-25. (CFTC Complaint, No. 11-CV-10949, attached to Meyer Defs.' Opp. at Ex. 4.) The pleading in that action claims that Watson "fraudulently solicited and accepted at least $45 million from more than 600 individuals" to operate a commodities pool "in a manner typical of a Ponzi scheme." (*Id.* ¶¶ 1-2.) Pursuant to an Order issued in that case, plaintiff was placed under receivership. (*See* 4/22/11 Order of this Court, docket no. 61.)

---

[8] Watson gave deposition testimony on two dates, October 5 and October 29, 2010, which the parties have designated respectively as Watson Dep. I and Watson Dep. II.

In March of 2011, the Meyer defendants moved to stay this case pursuant to a restraining order issued in the CFTC action. (See Letter Application to Stay, docket no. 57.) Counsel for Phillip S. Stenger, the appointed receiver in the CFTC action, opposed the stay, citing provisions of the appointing order in that court authorizing Stenger to choose to maintain the action here as "necessary to preserve or increase the assets of [Cash Flow Financial LLC]." (Stenger Letter dated 4/5/11, docket no. 57.)  The Court denied motion to stay, noting that "any recovery obtained [here] will, under the terms of the Restraining Order], flow to the Receivership Estate for ultimate distribution to the alleged fraud victims." (4/22/11 Order at 3.)

## DISCUSSION

### I.  STANDARD OF REVIEW

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and "after drawing all inferences and resolving all ambiguities in favor of the non-movant," that no rational jury could

9

find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion, *see Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).

## II. CHOICE OF LAW AND THE ELEMENTS OF PLAINTIFF'S CLAIMS

As an initial matter, the Court notes that that the parties either live or conduct their business in one of six different states: New York, Delaware, New Jersey, Florida, Minnesota, and Michigan. (Compl. ¶¶ 1-13.) Plaintiff's investment was made by transferring money to investment accounts with Merrill Lynch in Florham Park, New Jersey (Pl.'s 56.1 ¶ 1) and through the escrow account of defendant Morelli in Bellport, New York (*id.* ¶ 11). The record does not specify where the communications between the parties regarding the subject investments occurred.

Despite this diversity of locales, the parties do not directly address the issue of which state's laws should apply to plaintiff's fraud and conversion claims. However, the parties' citations to state law refer exclusively to New York cases. Where the parties' briefs "assume"

10

that New York law applies, [9] "such implied consent is sufficient to establish choice of law." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (alterations and internal quotation marks omitted)(citing *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). The Court will therefore analyze plaintiff's fraud and conversion claims under New York law.

To prevail under a claim for common law fraud in New York, the plaintiff must demonstrate: "(1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006)(citations omitted).

Conversion claims in New York require the following two "key" elements: "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50, 860 N.E.2d 713(2006)(citations omitted). "Although an action of conversion does not lie to enforce a mere obligation to pay money, it is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009)(internal citation omitted).

---

[9] In its reply memorandum of law, plaintiff argues for the first time that "where representations were made by Mr. Meyer in Minnesota to Mr. Watson in Michigan . . . New York law is not applicable." (Pl.'s Reply at 6.) Plaintiff, however, does not follow up this argument by suggesting what state law should apply in that instance, nor is there any evidence of where exactly these individuals were located when the subject communications took place. Furthermore, notwithstanding this hypothetical suggestion that New York law *may* not apply, plaintiff has cited no state law, in any of its papers, from outside New York.

11

### III.   PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT

### *a. Plaintiff's Motion as to the Meyer Defendants*

Plaintiff's motion for summary judgment against the Meyer defendants must fail as there exists a material issue of fact as to whether the claims against these defendants were discharged by the releases signed by Watson. As mentioned above, those releases disclaimed all causes of action against the Meyer defendants arising on or before the date of the release in exchange for $2,265,000. Plaintiff, however, contends that the Meyer defendants never made this payment, despite the fact that the language of the agreement, which Watson admits he signed, acknowledges receipt.

Nevertheless, because of the manner in which this issue was presented to the Court, it is not undisputed that this consideration payment was ever made. Plaintiff made no mention of these releases in its initial motion papers. Rather, the releases were produced by the Meyer defendants in their opposition. In the memorandum of law in support of their opposition, the Meyer defendants—perhaps tellingly—cite only to the fact that the agreement acknowledges receipt of payment, and to deposition testimony in which plaintiff admits that he signed the release. It was not until plaintiff's reply that Watson asserted that the consideration payment was never made. (*See* Pl.'s Reply at 8; Watson Dep. II at 160.) At that point, of course, defendants were no longer in a position to admit or deny whether payment was made, and therefore whether there was valid consideration for the agreement. As a result, the effect of the releases on plaintiff's claims is not undisputed.

Even assuming that the claims were not discharged through these releases, plaintiff fails to carry its burden to demonstrate that it is entitled to judgment as a matter of law. The analysis begins with plaintiff's claims of fraud, which allege the following acts:

12

1) Meyer told Watson that he had a "system for leveraged trading of T-bills that could produce profits of fifty percent per month," and that they could make as much as $200,000 per day. (Pl.'s 56.1 ¶¶ 3-4.)

2) Meyer told Watson via email that the investments were doing well, and that he had made $1.1 million in profits by the end of July 2009. (*Id.* ¶ 9-10.)

3) Meyer prepared a forged agreement between Cappaze, Watson, and Meyer regarding the use of the monies. (*Id.* ¶ 7.)

As to the first two allegations above, it is not disputed that Meyer made these statements. However, plaintiff offers no evidence that these statements were actually false, that they were made with knowledge of its falsity, or that Meyer made them with intent to defraud. For example, plaintiff makes bald conclusory allegations in its motion that Meyer did not actually possess a system to leverage T-bills, but offers no evidence that supports this assertion.[10] Further, although the Meyer defendants have not returned the entirety of the capital that plaintiff invested, there is no evidence that plaintiff's investments were not in fact making a $1.1 million profit when Meyer sent Watson the subject emails making that claim. Having failed to proffer evidence of the first two elements of fraud, the Court need not reach the Meyer defendants' arguments that plaintiff could not have reasonably relied on these purportedly fraudulent statements.

Turning to the allegedly fake agreement between Cappaze/Royal Sovereign and Watson, although Cappaze testified that he never signed the agreement, and that the signature on the document was not his, plaintiff offers no evidence that it was Meyer who forged the document.

---

[10] Purportedly in support of this claim, plaintiff cites to deposition testimony wherein Cappaze states that he does not recall whether he ever personally "owned" treasury bills, but insists that his company never did. (Pl.'s 56.1 ¶ 5 (citing Cappaze Dep. 31-35).) The cited testimony does, however, state that Cappaze used to use "zero coupons" to "leverage on a treasury," (Cappaze Dep. 30), and that "leverage" was among the things that Cappaze discussed with Meyer as an option for plaintiff's money, (*id.* 35).

Plaintiff's motion for summary judgment for fraud against the Meyer defendants is therefore denied.

The Court looks next at the conversion claims, which allege that Meyer made unauthorized investments of $712,240 and $761,000 of plaintiff's money in the United Arab Emirates and with 3 Hooligans respectively.  However, in order to prevail on a claim for the conversion of money, plaintiff must demonstrate the existence of an "identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Kirschner*, 648 F. Supp. 2d at 540.  Watson's own testimony is unclear as to whether the monies in the investment account were at all times solely intended for the use of leveraged purchases of T-bills.  For example, Watson testified at deposition that he received an email from Meyer in late July 2009 suggesting that Meyer was not using the investment money to trade in T-bills, but rather that "he's doing something with credit lines or banks." (Watson Dep. II at 75-76.)  Watson responded by email that it was his understanding that the money was to be invested only in T-bills, to which Meyer replied that this was a "better deal." (*Id.* at 76.) Watson, however, does not state that he instructed Meyer to change course or demand his money back at that point.  Instead, he testified that he was "very close" to doing so at that stage, and that at some point "shortly thereafter" he "started" to ask for the return of his investment. (*Id.*)  It is not clear from the record whether these dealings with "credit lines or banks" implicated the same two transfers at issue in plaintiff's conversion claim, nor is it entirely clear whether Watson acquiesced, at least to some extent, to Meyer investing his money in these alternative investments.  Without evidence that the Meyer defendants were at all relevant times obligated to treat these investment funds in a particular manner that was inconsistent with Meyer's two allegedly unauthorized transfers, plaintiff cannot prevail on its motion for summary judgment as to this claim for conversion.

Having addressed plaintiff's motion as to the Meyer defendants, the Court finds it necessary to briefly address one of the primary arguments raised in the Meyer defendants' opposition to the motion, *viz.* that "the Court should not assist a party in its efforts to recover 'improperly obtained' monies." (Meyer Defs.' Opp. at 13 (citing *inter alia Hofferman v. Simmons*, 290 N.Y. 449, 49 N.E.2d 523 (1943)).) Here, the Meyer defendants reference the allegations by the CFTC that plaintiff and Watson obtained the investment funds at issue in this action through fraudulent means. The Court notes at the outset that it is not aware that these claims have progressed beyond allegations in the CFTC action at this stage. Nevertheless, even if these allegations have since been adjudicated, plaintiff's arguments here have been mooted. As noted above, and as stated in this Court's April 22, 2011 Order, plaintiff has since entered into receivership, and "any recovery obtained [in this action] will, under the terms of the [Restraining Order in the CFTC action], flow to the Receivership Estate for ultimate distribution to the [alleged] fraud victims." (Order dated 4/22/11, docket no. 61.)

### b. *Plaintiff's Motion as to Defendants Cappaze and Royal Sovereign*

Plaintiff's motion for summary judgment on its conversion claims against Cappaze and Royal Sovereign must also be denied. As the facts above demonstrate, there is a material factual dispute whether Watson agreed to allow Cappaze invest his money in the gold venture in the first place, and whether Watson agreed to allow Cappaze to keep the $300,000 at issue in the gold venture after Watson demanded a return of the money. Plaintiff's motion for summary judgment as to defendants Cappaze and Royal Sovereign is therefore denied.

    *c. Plaintiff's Motion as to Defendants Durbin and SBC*

  Plaintiff's claim that it is entitled to summary judgment on its claims for fraud against Durbin and SBC comes down to a single factual allegation: that Durbin falsely represented that he held a bond in a safe deposit box "valued at more than $50,000,000." (Pl.'s 56.1 ¶ 16.) Plaintiff baldly asserts that "this representation was false, and Mr. Durbin had no reasonable grounds to believe it to be true." (*Id.*; *see also* Pl.'s Br. at 8.) However, there is no evidence that Durbin's statement was actually false. In fact, the only evidence before the Court on this point is the Loan Agreement itself and Durbin's deposition testimony in which he states that his company SBC made a loan to former defendant Worldwide, who gave Durbin a bond as collateral on this loan. (Durbin Dep. at 29-30.) Plaintiff fails to offer any explanation as to why this testimony is untrue, or why the bond, assuming it ever existed, was not worth what Durbin claimed it was when Watson invested with him. Without this evidence, plaintiff fails to demonstrate that it is entitled to summary judgment on its fraud claim against Durbin and SBC.

  Additionally, there are material issues of fact pertaining to whether plaintiff has standing to bring this claim. Specifically, Watson admitted at deposition that he did not actually know whether the $500,000 transfer came from his own money. (Watson Dep. II at 80:16-18.) Rather, he merely "believe[d]" the money was his because Meyer had purportedly represented to Watson that he did not have any other money of his own. (Watson Dep. II at 80, 83.) As the only relevant payments to Durbin were made by Meyer, whether plaintiff suffered an injury as a result of the alleged fraudulent representation hinges on whether the money involved in this transaction was in fact plaintiff's.

  Plaintiff's motion for summary judgment as to defendants Durbin and SBC is therefore denied.

## CONCLUSION

For the reasons stated above plaintiff's motion for summary judgment is denied in its entirety. The matter is hereby respectfully referred to Magistrate Judge Boyle for final pretrial supervision.

SO ORDERED.

Dated: Central Islip, New York
       August 22, 2012

                                                   _____/s_____
                                                   Denis R. Hurley
                                                   United States District Judge